Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| D.R., and L.R., <br><br> Plaintiffs, <br><br> vs. <br><br> ANTHEM BLUE CROSS and BLUE SHIELD, and the TOYOTA INDUSTRIES NORTH AMERICA, INC. WELFARE BENEFIT PLAN. <br><br> Defendants. | COMPLAINT <br><br> Case No. 2:22-cv-00091 - HCN |

Plaintiffs D.R. and L.R., through their undersigned counsel, complain and allege against Defendants Anthem Blue Cross and Blue Shield ("Anthem") and the Toyota Industries North America, Inc. Welfare Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. D.R. and L.R. are natural persons residing in Union County, North Carolina. D.R. is L.R.'s grandfather.

2. Anthem is a member of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). D.R. was a participant in the Plan and L.R. was a beneficiary of the Plan at all relevant times.

4. L.R. received medical care and treatment at Elevations Residential Treatment Center ("Elevations") from March 10, 2020, to June 22, 2020, and New Focus Academy ("New Focus") beginning on June 22, 2020. These are licensed treatment facilities located in Davis County, Utah and Wasatch County, Utah respectively, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Anthem, acting in its own capacity or through its subsidiary and affiliate Anthem UM Services, denied claims for payment of L.R.'s medical expenses in connection with his treatment at Elevations and New Focus.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah, and the treatment at issue took place in Utah. Moreover, the Plan sponsor, Toyota Industries North America, Inc., has significant business operations in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### L.R.'s Developmental History and Medical Background

9. When L.R.'s father discovered that L.R.'s mother was pregnant, he abandoned them both and moved out of state. Not knowing his father has always been a source of anxiety and anger for L.R.

10. L.R. lived with his mother as a young child but his home life was very erratic and he often bounced around from place to place. On one occasion, he witnessed one of his mother's boyfriends slit his wrists which resulted in the police being called. This event happened right in front of L.R. and was very traumatizing for him.

11. Around the time that he was five years old, L.R. was placed in the legal custody of his grandmother and D.R. L.R. had difficulty making and keeping friends and mostly kept to himself. L.R. perceived himself as different and socially awkward and would often say, "I just don't care anymore, I wish I were dead." He met with doctors and was prescribed various medications, but he had frequent mood swings and they didn't seem to help.

12. L.R. experienced hand tremors and schoolwork was difficult for him, he was diagnosed with ADHD and had attention problems and difficulty sitting still. L.R. was given a 504 plan and an individualized education program while at school.

13. L.R. started meeting with a therapist at the age of six and was given a neuropsychological evaluation. L.R. was withdrawn from middle school shortly after he started due to difficulties with bullying and his poor academic performance. L.R. started attending a small private school on the condition that he repeat the fifth grade. After staying there for a year, the school asked L.R. not to return.

14. L.R. began attending another private school but started exhibiting significant school related anxiety and it became difficult to get him to go. L.R.'s new school made significant attempts to accommodate him but after several years they determined that L.R. required a more supportive environment where he could receive therapeutic support from mental health professionals.

15. L.R. saw a wide variety of therapists and had multiple psychological evaluations but none of these interventions were sufficient to manage his mental health conditions. L.R. was diagnosed with Depression, Anxiety, Reactive Attachment Disorder, and Attention-deficit Hyperactivity Disorder.

16. L.R. increasingly isolated himself and stopped participating in activities which he used to enjoy. Around the time that L.R. was fourteen years old, the police were called to the house because a peer witnessed an online video of him threatening to kill himself with a knife.

17. Shortly afterwards, L.R. brought a knife to school and again threatened himself, causing him to be suspended from school. L.R. was suspended on other occasions as well, for doing things like bringing e-cigarette paraphernalia to school.

18. L.R. saw a variety of mental health professionals but none of them were able to offer him the help he needed. One of his therapists, Christina Bronte, recommended that L.R. be placed in a residential treatment program as she felt L.R. needed more intensive care than what she could provide.

**Elevations**

19. L.R. was admitted to Elevations on March 10, 2020, with Anthem's approval.

20. On April 15, 2020, Anthem denied payment for L.R.'s treatment from April 14, 2020, forward. The unidentified reviewer offered the following justification for denying care:

> The request tells us you went to a residential treatment center for your mental health condition. The program asked to extend your stay. The plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self-care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care or to keep from getting worse. The information we have does not show you are a danger to yourself or others or that you are having serious problems functioning. You are medically stable and your condition is likely to further improve with this care or get worse without it. [sic] For this reason, the request is denied as not medically necessary. There may be other options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

21. On July 16, 2020, D.R. submitted a level one appeal of the denial of L.R.'s treatment. D.R. reminded Anthem that according to ERISA he was guaranteed certain protections in

the review process, including a full, fair, and thorough review using appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasoning for the adverse determination, referenced the specific plan provisions on which the decision was based, and which gave him the information necessary to perfect the claim.

22. He contended that L.R.'s treatment was medically necessary and had been recommended by his treatment team. D.R. included letters of medical necessity with the appeal, in an undated letter Christina Bronte, MSW, LCSW, wrote in part:

> I was [L.R.]'s therapist from November 20, 2018 to March 2, 2020. I met with [L.R.] weekly, except when he was away at camp, ill or undergoing psychological testing. At the time he was referred, [L.R.] had been in therapy for over 2 years for behavioral and emotional difficulties with little impact or change.
>
> [L.R.] presented with issues of depression, anxiety and histrionic attention-seeking behaviors. He was being raised by his maternal grandparents who took legal guardianship of him when he was five years old due to his mother's emotional instability and chaotic, sometimes violent relationships with men. His history included cutting, chronic school failure, problematic relationships with his family and peers, chronic pathological lying, chronic exaggerated somatic complaints, smearing feces, poor hygiene, both aggressive and passive-aggressive manipulative behaviors at home and school and a lack of kindness and empathy toward family members. He had also been recently banned from FaceBook for posting images and making suicidal gestures/statements.
>
> Within months of beginning treatment with me, [L.R.] was accused of mutilating a dead racoon [sic] by a neighbor who witnessed the incident. [L.R.] denied killing the racoon [sic] but admitted to skinning it out of fascination to determine how it died. He also began to get erections in session and failed to respond appropriately or leave the office when requested. As a result, I instituted a safety plan with him and his grandmother to address the issue. …
>
> In Fall of 2019, [L.R.]'s behaviors began to escalate once again and his mood destabilized. This had a lot to do with [L.R.]'s inability to perform in school and get along with teachers and classmates. By late Fall [L.R.] was refusing to participate in school. He was frequently angry in therapy and would cuss and complain about his grandparents [sic] demand for accountability and following rules. His somatic complaints also increased and he began to pick at his skin causing it to bleed. He would show the scabs to classmates, his grandparents and

> me in session, demanding additional attention and physical care. He started posting pictures of these self-inflicted injuries on social media for attention. Shortly thereafter, during an online video chat with a girl from school, he stated he suffered from depression and displayed a BB gun in the background, leading her to believe it was a rifle and intimating he intended to kill himself. …
>
> At this time I believed [L.R.]'s behavior warranted a higher level of care due to his emotional instability, increased oppositional behavior, school refusal and lack of meaningful participation in therapy. I met with his grandparents to discuss these options. His grandparents presented with burnout and fatigue due to [L.R.]'s behaviors and his grandmother revealed she was experiencing acute anxiety due to [L.R.]'s increasingly bad behaviors and labile mood. I therefore recommended residential treatment for stabilization, medication management and intensive treatment.
>
> In my opinion, residential treatment is needed to address the multitude of mental health issues facing [L.R.] and he should remain in treatment as long as is recommended by his treating physician and therapists.

23. D.R. contended that it was not safe for L.R. to remain at home and that his diagnosis of Reactive Attachment Disorder was notoriously difficult to treat and required highly specialized care in a controlled environment and would not be able to be adequately resolved in the short period of time Anthem authorized for L.R.'s treatment.

24. He wrote that Anthem should not have disregarded the opinions of the medical professionals who had actively witnessed the deterioration of L.R.'s condition.

25. D.R. included copies of L.R.'s medical records with the appeal. These records showed that L.R. continued to struggle with self-harming behaviors, isolating himself, verbal hallucinations (including command hallucinations telling him to harm others), distorted thinking, suicidal ideation, getting into confrontations with staff, and attention seeking behaviors such as purposefully causing himself to bleed just to get attention. L.R. exhibited these behaviors even while he was in the supportive and controlled environment of a residential treatment center.

7

26. D.R. alleged that the MCG criteria utilized by Anthem violated generally accepted standards of medical practice. He referenced the court decision in *Wit, et.al., v. United Behavioral Health* in which the court had found proprietary guidelines similar to those utilized by Anthem to violate generally accepted standards of medical practice in multiple respects such as an overemphasis on acuity of symptoms.

27. He stated that Anthem's use of factors such as its declaration that "The information we have does not show you are a danger to yourself or others or that you are having serious problems functioning" showed that Anthem relied on many of the same factors which the *Wit* court had found to be impermissible. He stated that this likely qualified as a non-quantitative treatment limitation under MHPAEA.

28. He pointed out that United had written "your condition is likely to further improve with this care or get worse without it" and contended that this seemed to confirm the medical necessity of treatment rather than refute it. He wrote that medically necessary treatment was obviously intended to improve a patient's condition.

29. He argued that by requiring acute level symptoms such as the presence of self-harm in order to approve a sub-acute level of treatment, Anthem had essentially conflated inpatient hospitalization with residential treatment care. He stated that if L.R. had been experiencing the symptoms noted in Anthem's denial letter then he would require treatment in an acute, inpatient hospital setting rather than at a residential treatment center.

30. He pointed out that Anthem had approved 35 days of L.R.'s treatment even though he was not experiencing acute level symptoms during this timeframe, but after denying coverage, it ignored the fact that there had been no appreciable change in L.R.'s

condition and denied further care based on factors which had previously not proven to be an issue.

31. He asked Anthem to clearly identify what had changed in L.R.'s medical records to suddenly render his treatment no longer medically necessary after April 13, 2020. D.R. expressed concern that Anthem's denial was dictated by financial interests.

32. He noted that the term "medically necessary" was not even defined in his governing plan document and that he had to conduct a thorough search of external criteria to see how Anthem defined the term. He stated that omissions of such a critical term was deeply concerning and made him question whether Anthem was complying with ERISA's minimum requirements.

33. He contended that Anthem had failed to take into account the fact that L.R. had repeatedly attempted treatment at the outpatient level but it had been unsuccessful.

34. He asked Anthem to provide him with a copy of the governing plan documents as well as any internal notes from the reviewer.

35. In a letter dated February 16, 2021, Anthem upheld the denial of payment for L.R.'s treatment. The letter was attributed to an unnamed medical director and gave the following justification for the denial:

> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to stay longer in residential treatment center care. You were getting this because you had been at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record plus letters. We still do not think this was medically necessary for you. We believe our first decision is correct for the following reason: after the treatment you had, you were no longer at risk for serious harm that needed 24 hour care. You could have been treated with outpatient services. We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

## New Focus

36. L.R. was admitted to New Focus on June 22, 2020.

37. In an Explanation of Benefits ("EOB") statement dated August 9, 2020, Anthem denied payment for L.R.'s treatment under remark code 707:

    > Under the terms of your coverage, this type of service must be preauthorized or no benefits are payable. Since preauthorization was not requested for this service, no benefits are payable, and these charges are your responsibility.

38. On August 26, 2020, D.R. submitted a level one appeal of the denial of payment for L.R.'s treatment. D.R. pointed out that not only did the terms of the insurance policy not contain any penalty for a failure to obtain preauthorization, but they explicitly allowed for a retrospective review to be performed in the event that preauthorization was not obtained.

39. D.R. asked that a retrospective review be performed which respected his rights under ERISA to a full, fair, and thorough review. He again asked to be provided with a copy of the documents under which the Plan was operated.

40. In a letter dated November 24, 2020, signed only by Anthem, D.R. was informed that the denial was upheld. The letter stated in pertinent part:

    > The request for psychiatric residential treatment is not covered. This service is not covered at out-of-network facilities that lack accreditation. This review was a benefit review. It was not about treatment. This review looked only at the benefit plan. If your policy has not terminated, you may have other benefits available to you. Please contact us for further information.

41. On January 20, 2021, D.R. submitted an appeal of L.R.'s denied treatment at New Focus.

42. He stated that coverage was available under the terms of the insurance policy for the treatment L.R. received. He noted that the Plan listed only one clear requirement in the

insurance policy for residential treatment centers, that they were "licensed and operated as required by law." D.R. contended that New Focus met this requirement.

43. He wrote that the insurance policy then went on to list other items such as accreditation by The Joint Commission but that it was unclear if this were a list of mandatory requirements or just a list of the types of facilities for which Anthem would approve coverage.

44. He argued that the language of the insurance policy was ambiguous but Anthem was interpreting it in an overly restrictive manner. He again asked to be provided with a copy of the governing plan documents.

45. In a letter dated February 18, 2021, addressed to and signed by **"Error! Reference source not found."** [sic] Anthem upheld the denial of payment. The letter gave the following justification for the denial:

> After careful review, the administrative denial of psychiatric residential treatment center level of care at New Focus Academy for dates of service June 22, 2020 forward due to the facility not being appropriately licensed/accredited has been upheld. The provider, New Focus Academy is not accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA). Your policy requires that all residential treatment centers/facilities be accredited by either The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA). On page 91, under the definition of Residential Treatment Center/Facility it states:
>
> **Residential Treatment Center/Facility**
> A Provider licensed and operated as required by law, which includes:
> - Room, board and skilled nursing care (either an RN or LVN/LPN) available on-site at least eight hours daily with 24 hour availability;
> - A staff with one or more Doctors available at all times.
> - The resources and programming to adequately diagnose, care and treat a psychiatric and/or substance use disorder.
> - Facilities are designated residential, subacute, or intermediate care and may occur in care systems that provide multiple levels of care.

- Is fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA).

The health plan's determination is not a violation of the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) and is not imposing Non-Quantitative Treatment Limitations. We treat residential treatment centers the same as all intermediate levels of care and we are not holding your residential treatment to a stricter standard. All facilities under the plan require that they be accredited, including Skilled Nursing Facilities. On page 86 of your benefit booklet, under the definition of Facility it states:

**Facility**
A Facility, including but not limited to, a Hospital, Freestanding Ambulatory Facility, Chemical Dependency Treatment Facility, Skilled Nursing Facility, Home Health Care Agency or mental health Facility, as defined in this Benefit Booklet. The Facility must be licensed, accredited, registered or approved by The Joint Commission or the Commission on Accreditation of Rehabilitation Facilities (CARF), as applicable, or meet specific rules set by the Claims Administrator.

Lastly, [the R. family] made a request for copies of all documents under which the plan is operated, the certificate of coverage, criteria and guidelines used for the benefits you are seeking and all reports from physicians. We are happy to provide this information and will be mailed [sic] under a separate cover. (emphasis in original)

46. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

47. The denial of benefits for L.R.'s treatment was a breach of contract and caused D.R. to incur medical expenses that should have been paid by the Plan in an amount totaling over $130,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

48. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing

solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

49. Anthem and the Plan failed to provide coverage for L.R.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

50. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

51. D.R. repeatedly reminded Anthem of its statutory obligations under ERISA, such as its responsibility to utilize appropriately qualified reviewers and to disclose their identities. In spite of its obligations to do so, Anthem refused to divulge this information.

52. Anthem and the agents of the Plan breached their fiduciary duties to L.R. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in L.R.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, and to provide a full and fair review of L.R.'s claims.

53. The actions of Anthem and the Plan in failing to provide coverage for L.R.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

//

//

## SECOND CAUSE OF ACTION

## (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

54. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

55. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

56. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

57. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

58. The medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

59. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for L.R.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

60. For none of these types of treatment does Anthem exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

61. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

62. Anthem and the Plan evaluated L.R.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

63. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Anthem's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that L.R. received.

64. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as "The plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a danger to

themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care)."

65. Individuals experiencing the symptoms identified by Anthem in this statement may not properly be treated at a sub-acute inpatient treatment level. Generally accepted standards of medical practice require patients with this severity of symptoms to be treated at an acute inpatient hospital level of care.

66. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that L.R. received.

67. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

68. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

69. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

//

70. Anthem also failed to mention in its responses that it approved the initial portion of L.R.'s treatment, even though L.R. was similarly free from acute level symptoms during this time. D.R. challenged Anthem to demonstrate a change in L.R.'s condition between the dates it approved versus those it denied. Anthem either refused or was unable to do so.

71. Another sign of a likely MHPAEA violation is the requirement of improvement for mental health services, but not for medical or surgical services. Anthem made the approval of L.R.'s mental health treatment contingent on improvement, stating that residential treatment is necessary for individuals who are "expected to either improve with this care or to keep from getting worse." However, Anthem does not require improvement for substantially all comparable medical or surgical services as a prerequisite to approving payment of that care.

72. In addition, D.R. contended that Anthem's denial based on a lack of accreditation was overly restrictive and was a limitation applied to restrict the availability of residential treatment care. The reviewer responded by quoting the definition of a residential treatment facility which he identified as:

> **Residential Treatment Center/Facility**
> A Provider licensed and operated as required by law, which includes:
> - Room, board and skilled nursing care (either an RN or LVN/LPN) available on-site at least eight hours daily with 24 hour availability;
> - A staff with one or more Doctors available at all times.
> - The resources and programming to adequately diagnose, care and treat a psychiatric and/or substance use disorder.
> - Facilities are designated residential, subacute, or intermediate care and may occur in care systems that provide multiple levels of care.
> - Is fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA).

73. The reviewer then quoted the definition of a facility which stated:

> **Facility**
> A Facility, including but not limited to, a Hospital, Freestanding Ambulatory Facility, Chemical Dependency Treatment Facility, Skilled Nursing Facility, Home Health Care Agency or mental health Facility, as defined in this Benefit Booklet. The Facility must be licensed, accredited, registered or approved by The Joint Commission or the Commission on Accreditation of Rehabilitation Facilities (CARF), as applicable, or meet specific rules set by the Claims Administrator.

74. While the reviewer intended to offer these excerpts as examples of MHPAEA compliance, in actuality they provide evidence of a facial MHPAEA violation in Anthem's insurance policy.

75. For instance, a facility is only required to meet accreditation requirements "as applicable, or meet specific rules set by the Claims Administrator." No such exception is offered for residential treatment services.

76. While Anthem does impose some limitations on out-of-network care such as a reduced payment for services, on information and belief it does not apply any such out-of-network limitation such as the aforementioned accreditation requirement on substantially all out-of-network intermediate level medical or surgical facilities.

77. The actions of Anthem and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

78. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or

in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

79. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

80. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for L.R.'s medically necessary treatment at Elevations and New Focus under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 14th day of February, 2022.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Union County, North Carolina.